Good morning, ladies and gentlemen. Before we start this morning, I would like to call everyone's attention to the fact that Judge Rovner is in fact here with us. You will see her on the video screen and you will hear her asking questions. So please give our technology just a half a second to work when that happens. We are now ready for our first case of this morning, which is United States v. Jose Trinidad Garcia and Alfonso Pineda-Hernandez. Mr. Henderson. Good morning. May it please the Court. My name is Peter Henderson. I represent Jose Trinidad Garcia. The goal when we're doing a categorical approach analysis is to figure out what is the offense of conviction and whether that offense of conviction matches or is broader than the federal offense. Mr. Trinidad Garcia was convicted under a statute that includes salvia, and so is broader than the federal offense. And so the question is, is that specific statute, does that prescribe one offense or does it contain multiple offenses? The Indiana Court of Appeals has said it's one offense, and so we know the offense of conviction. It is a statute. It's not divisible. The government has agreed that this statute is overbroad, and so that really is the only legal question, whether the statute is divisible. The Indiana Supreme Court laid the foundation for describing the statute as indivisible when a defendant was caught with seven different controlled substances under a separate law. And the Indiana Supreme Court says if that's just involved in a single sales transaction, that's a single statutory violation. So this is this whole nightmare, if I can call it, under Mathis of trying to figure out which are simply alternative means of committing the same offense and which are actually different offenses. And we're under, looking at your reply brief, page 11, we're under subpart 10A, right? 3548-4, 10A. So there are, each of these other things I assume would be divisible that you've listed. Correct. There are multiple offenses within this particular statute, but the statute of conviction that Mr. Trinidad-Garcia was convicted of is not divisible. Was 10A, so that's the marijuana, hash oil, hashish, or salvia. Correct. So some indictments that the government points to do single out marijuana, as I recall. Correct. And almost all of them refer to the weight of the marijuana. And so when a misdemeanor is aggravated to a felony based on the weight of the drug, then that is going to be a separate element. You have to prove that it involves so much amount of marijuana. Most offenses under the current statute that was amended after Mr. Trinidad-Garcia was convicted are going to be divisible because most of them are about how much weight was there of a particular drug. But in our case, it's just alleged it could be any of these drugs. And the state courts have treated those as alternative means of committing one offense rather than as elements of different And it's the only case addressing this statute, section 3548.4.10A, is Everoad v. State. And in Everoad, the person possessed both marijuana and hashish at the same time. Was that a lower court decision? It was the Indiana Court of Appeals. That's correct. Which is, I think you pointed out, is a unified court. It's a unified court. So the law of the Indiana Court of Appeals applies to all of Indiana. And the Supreme Court has weighed in on a different statute, and that gave rise to the intermediate court's decision in Everoad. But we know that if you possess two substances under this subsection, that's one offense. If they were elements, that would be two offenses. And so we know that these must be means. So we think this error is plain. There's alternative means of committing one offense. The categorical approach is set, and it certainly affected Mr. Trinidad-Garcia's substantial rights by increasing his sentence by probably at least five years in prison. Mr. Henderson, good morning. Of course, had he been sentenced just eight months later because of 2018, he would not have faced the mandatory 20 years in prison, you know, due to the fact that he only spent two days. But what I'm wondering now is, will the First Step Act of 2018 apply? Should Mr. Garcia be resentenced? I think it would, because at that point, a sentence has not been imposed. A sentence was imposed. It wouldn't make a practical difference. Because this doesn't qualify as a felony drug offense, the mandatory minimum sentence would be 10 years under the old law and 10 years under the new law. So we think Congress has clearly said this type of prior conviction should not be used to enhance a sentence under the First Step Act. But regardless of whether that applies or not on resentencing, because this is not a felony drug offense, the mandatory minimum will be 10 years. Well, so it's a question of, does the judge get to pick the sentence or does the prosecutor get to pick the sentence? And so we think it's a fine idea to let the judge do that on remand. And that's the only relief you're seeking, right? Remand for resentencing. Yeah, exactly. So I will reserve the remainder of my time for rebuttal. Okay, thank you very much. Mr. Ball. Good morning, Your Honors, and may it please the Court. My name is Andy Ball, and I represent the appellant in case number 18-2261, Mr. Alfonso Pineda-Hernandez. At the height of Mr. Hernandez's five-day jury trial, the translation of testimony from a key Spanish-speaking cooperating witness was subject to such grave doubt that two federally certified and court-appointed interpreters saw fit to cry foul. And this Court recognized that more than 30 years ago, a defendant's due process rights are violated when the scope and accuracy of translation at trial is subject to such grave doubt. So can I tell you, Mr. Ball, a couple of concerns I have about your position? I'm not personally concerned that he waived any rights to appeal. He seems to have been very clear that he didn't want to do that. But what I don't see in the record is any request to the District Court for a mistrial, which it seems to me, given the path the District Court was going down, is actually what he probably needed to ask for. And I don't see, from a different point of view, when I compare Mr. Barragan-Lopez's testimony from the first day and the second day, it's very hard for me to find prejudice on this case. If you could address those points, I would appreciate it. Yes, Your Honor. It's true that defense counsel did not move for a mistrial. But it's also true that the court seemed to take, as a given, the government's proposed two courses of action that both forced Mr. Hernandez to shoulder the risk of harm here, either standing on a potentially incompetent translation on the one hand, or inviting this witness to come back and give wholly cumulative and prejudicial testimony. But why was it so bad? I mean, yes, Mr. Barragan-Lopez testified. Maybe that was like introducing the same testimony twice. There were some minor differences in his testimony, but really not a lot. And there was an tendency to show that the jury obviously credited and showed Mr. Pineda's guilt. Yeah, that's certainly a fair reading of the record, Your Honor. But the two key points. First is that Mr. Hernandez raises two claims of error from this translation issue. One is a court due process claim, and the core due process claim is a focus on grave doubt, not certainty of error. This court's rule in Serencinon does not require certainty of error. And implicit in that ruling is a recognition of the realities of live in-court translation. In this case, as is likely common in many cases with live in-court translation, there is no record of the source language, so to speak. So there's no record of the Spanish questions that were asked to this witness after translation, and there's no record of the Spanish responses. And what that means is that there is uncertainty as to the scope of any potential error. But as you say, that's common. I mean, I'm very sensitive to these issues of translation. I've probably spent as much time as I can on words translated into this and that languages, and I wouldn't have known whether the Chinese translation was right or not. I mean, you're at the mercy. But this is the way we do it. We have the federally certified interpreters. Mr. Pineda agreed to the private or the non-federal interpreter for Barragán-López, and we When the interpreters raised the point, the district judge responded. The district judge thought, okay, I need to fix this. So different arrangements were made for the second day, but you would expect a different result then, and you didn't really get a different result. Your Honor, I would respectfully disagree slightly that there were, as you pointed out earlier, there were key differences from day one to day two. I didn't say key. I said some differences. Apologies, Your Honor. The difference between pinkish and red and pinky transparent just didn't strike me as huge. Understandable, Your Honor. And in many cases, that difference might well be inconsequential. But here, that difference went to a key theme of the government's case that was present throughout the investigation and the government's back on the importance of that key detail that connected Mr. Hernández to a conspiracy. This wasn't, there was no direct evidence of him engaged in distribution of methamphetamines. So those visual cues were important to tying the government's case together. But an even more critical difference was between the first and second testimony from Mr. Barragán-López was the Mr. Hernández's role in the conspiracy. On day one, Mr. López purportedly testified that Mr. Hernández was merely the recipient of the methamphetamine. On day two, he testified that he was in charge. But beyond that, that only happened once, right? In other words, so do you think that that change in language, the one description of Teneda, Hernández as a proposed to a procurer of drugs, was so significant as to cause plain error? Is that your bottom line? Not exactly, Your Honor. It is more than just that one instance of discrepancy between the two days of testimony. Again, the question here is merely whether there is grave doubt as to the scope or accuracy of trial, not whether we have certainty that there were errors. And so those differences from day three to day four are not, this Court should not look at those alone. But why not, you didn't address, you didn't call our attention to anything else, and you do at least have the English version of the transcript for both days. That's correct, Your Honor, but this Court should take into account, in addition, the actual claims of error raised by the two disinterested, federally certified interpreters. Those grave doubts are still there in the record, and they included, one, that Mr. Ramos apparently used a questionable method of translation. Two, that Mr. Ramos omitted words from nearly every exchange that this key government witness had with... I haven't heard those omitted words either the first day. The second testimony doesn't fix this because of the uncertainty. The uncertainty that the jury may have convicted Mr. Hernandez on the back of evidence that wasn't what it purported to be. In other words, there's a risk that the jury convicted Mr. Hernandez on language and testimony that purported to be from this key government witness, but was actually from the mouth of a potentially incompetent translator. So you, there was some discussion about whether the jury should be instructed to disregard everything that Mr. Barragán-López said the first day, and the judge decides not to do that. She just says, let them, you know, just take it for what it's worth. But you haven't really raised that as an error, have you? No, not specifically, Your Honor. As this court pointed out in LIEVA, the focus of the due process claim is the translation itself, not the actions or inactions of the trial court, laudable as perhaps they were. But a due process claim requires prejudice, and that takes me back to, you know, if the judge had instructed the jury, disregard this potentially unreliable set of testimony. Now I'm going to give you something that you can rely on. Perhaps you, I mean, we believe that juries follow these instructions. That's the way we have to run the system. If we, we would have a different case, I think. But you didn't, but counsel didn't ask. That's correct, Your Honor. Counsel didn't ask, and I agree that that probably would be a different case. But that does not eliminate the reality that there is a significant possibility that the jury convicted the defendant based on evidence that that wasn't what it purported to be. And that's what— Seems speculative to me. Your Honor, respectfully, I would view it more as uncertainty rather than speculative. And that's inherent in this court's own ruling. Well, if you had more examples of discrepancies between the first day and the second day, when the full context comes out, just as, you know, we have the, he received the methamphetamine from Mexico testimony the first day, and maybe he was about to say, you know, because he ordered it to come or something. But if the interpreter was interrupting and failing to allow sentences to be completed, as the interpreter said, not paying attention to syntactical rules for Spanish, which are different, of course, from English rules. But we don't, I feel like we would see marks of that in the transcript. Your Honor, if there were more examples of inconsistency, I agree that this would be a clearer case. But again, that doesn't—the errors and the concerns raised by these disinterested, federally certified interpreters are still out there. They never walked away from those— Right, and the judge tried to fix it by getting a different interpreter. That's where, I mean, obviously the government's put all of its eggs in that basket. Yes, that's correct, Your Honor. The trial court, again, did try and fix this, but did not eliminate the uncertainty that the testimony from Berrigan-Lopez was not accurately translated. And the logical conclusion of the government's argument is really, it's an attack on the credibility of these two federally certified court-appointed interpreters. Well, occasionally, once in a while, during deliberation, the jury may send out a question, say, hey, should we figure out which of which to follow? Or is there some confusion? But I don't think the jury did anything. No, Your Honor, not on this point.  That's correct. Just briefly, Your Honors, respectfully— We're just about out of time, so— Yes, that's all right. I would just ask that this court vacate Mr. Hernandez's convictions and remand him to the district court for trial, not infected by those grave doubts, by that uncertainty. Okay. Thank you. Thank you very much. Mr. Wood. Your Honor, may it please the court, Bob Wood on behalf of the government.  We're here on plain error review, and I'll say sheepishly, thankfully so. This isn't the strongest argument I've ever had, but I will say that we have a case on point in Everoad that relies on a case sort of circumstantially on point in Duncan. And we have the one case, admittedly, but that the government has cited Gates, which didn't just say Duncan and the two statutory interpretation cases that it cited, Martin and Bates, don't control, but acted that way by viewing six separate charges based on six separate drug types as okay. And whether— You know, it's really—it is a little off on the side. And the government has this somewhat weird comment in the brief about, you know, if we take a stiff interpretation of the categorical rule. I mean, it's—this case is all about the modified—whether there are different offenses or simply different means. And frankly, looking at the structure of the statute to start with, looking at Everoad, secondly, about this very law, we regularly rely on state appellate courts in Erie context, we rely on them in this context, and I don't see a thing from the Indiana Supreme Court that tells us we shouldn't. Sure. And to the extent that the government's position about reliance on intermediate state courts was misunderstood in the reply brief, what I was trying to say was that it's a nuanced approach and where, you know, in Jara-Rodriguez, the court obviously entertained the idea of potentially relying on intermediate state courts. Well, if that was—if it was misinterpreted in the reply brief, it was misinterpreted when I read it, too, because I kept thinking, is it really the government's position that we can't rely on precedent from an Indiana appellate court? I couldn't believe what I was reading. And, Your Honor, that's why I said in both of the sentences where I said that, I said, plus the fact that the analysis was so meager. And so my point there— But we don't—think of—just imagine, I invite you to come to the courtroom any time we have a 2254 case set for argument. We are repeatedly told it's not our job to write opinions for the state courts. If we can tell what the state court is doing, then—especially on a matter of state law—then they're the boss, not us. I'm flabbergasted at the notion that we would be picky about Everode based on whether it, you know, meets a law school class standard. And, Your Honor, all I would say to that is I'm trying to give meaning to Mathis's authoritative and definitive phrasings. And if a paragraph citing Duncan is authoritative in light of Gates, which says Duncan is—which acts and says Duncan is no longer good law, and all Everode has to go for it is Duncan, then all I would submit, Your Honor, is that the government's position in this case is that that renders the error not plain. And that is—that's the full extent of the government's argument here. And I say that because I want it to be a credible argument. And the credible argument is there is some dissension about how these statutes apply. And I'd also add— And remember, Duncan was a different section of the statute. Sure. And it was a different section than Gates. And so, you know, looking at section by section, as the reply brief did here, you know, some sections are going to have a lot of substances included within the statutory offense. This particular one seems to have four—marijuana, hash oil, hashish, and salvia. It just— And Everode didn't have salvia. It was otherwise structurally similar. So I don't take that argument too far. Salvia was introduced in 2011, which I will admit led me to cite the wrong statute and rely on a textual argument base that Mr. Henderson correctly pointed out was mistaken. And I'll happily abandon that textual argument. But the rest of it, I still think, Gates shows that at least currently the state treats the statute as divisible by drug type and— It's unpublished. It's non-presidential. I agree. And it relies on Richardson for that proposition. And I'll also just add really quickly that in my muddling of the statutes that changed three times in four years, I did miss one argument that I would have made, and I told Peter about this beforehand. You might understand if it's forfeited, but there were no salvia prosecutions until 2014. So there is a Duane Ness argument to be made that there never will be any salvia prosecutions under the statute of conviction that underlies the 851 in this case. That goes, of course, I understand, Your Honor, to what the phrase reasonable possibility means. Salvia is in the statute. I get that, but there never— It is in the statute. And, you know, we're constantly hammered, you know, to follow the words of the statute. It's in there. The Indiana legislature put it there for some reason, one assumes. I agree. I would just be remiss in not pointing out that there never were any salvia prosecutions, and there never can be any salvia prosecutions under the statute that Mr. Henderson rightly points the court to. And with that, I don't think I have more on Mr. Trinidad-Garcia's argument, other than to say I don't think the error is plain. And to the extent there's a misunderstanding about how the government is pressing plain error review, it's all about the plainness of the error and the integrity of the court. Of course, the drop of a mandatory minimum affects someone's substantial rights. There's no argument there. Our argument has always been— And so it's on the plainness point. It's not plain. And moving to the translation errors, this court has erected sort of a two-part standard. There have to be grave doubts about the translation, and that goes back to the 1985 case. And then, under Sandoval, they have to undermine the verdict. And the government would submit that Mr. Pineda-Hernandez can't meet either. Well, but surely, I mean, if two federally certified interpreters take the initiative to go to the court and say, this is a bad translation, what else does it take for there to be grave doubt? These are people who are not just, you know, bilingual. It's hard to do this kind of translation. I don't know if you've ever tried, but it's hard. My wife's—my father-in-law is a Korean translator in federal court. So you appreciate it. Incredibly difficult. It's a very intellectually demanding thing. And so these people go to the judge appropriately, voice their concern. So why isn't that enough, at least, to satisfy the grave doubt side of the Cirincione test? I would say that, regardless of the context, this court asks for some specificity in the errors that have been identified. And then, separately— Well, they weren't taking notes. They tried to say, he's jumping in before the end of the sentence. He's not allowing the thought to be completed. It's messing up the syntax. It's— Well, I'd say two things. First, there was a redo, and the redo both fixed the certainty problems. How can there be any uncertainty when there are no claims of error in the redo? And second, the redo shows, as Your Honor said, and as the government tried to detail in our brief, that no one can point to any major problems in the translation. And that also goes— What about the second one? I'm not too impressed with pinky transparent versus pinkish, or even red, given this was the code red case. But talking about Mr. Pineda receiving the meth from Mexico is one thing. Saying that he was in charge, and then having the government pick up on exactly that phrase at the end of the case is something quite different. It is different, I agree, Your Honor, but there was so much evidence that he was in charge. The entire—Bergen-Lopez was a surprisingly good witness, not a key witness in terms of the way the government was laying out the case. He ended up being very helpful, but the case depended in substantial part on Araujo Ordonez's controlled purchases, which were all Pineda-Hernandez. And that included Pineda-Hernandez telling him, go sell more, sell more and get back to me. And driving around with Paniagua and telling him, take me here, take me here, take me here. And then employing a middleman in Aurelio Estrada to go get money for him. That phrase was never uttered by anyone else, of course, in charge, but the jury saw that he was in charge. And admittedly, two people were in charge, as the government tried to explain and as the PSR states, a woman introduced these two men so that they could start a drug organization. And they did, and they led it together. And Nico, for the most part, obtained the drugs from Mexico. The evidence at trial and in the PSR basically says as much. But the source, so it depends on what you mean by source, but the source of the drugs to the men was more often than not Pineda-Hernandez. And it's not clear from the trial record why they set up their arrangement that way, but they were both in charge of the organization. And I'd also say because, you know, I hesitate to go very far with this, but in the interest of, Mr. Ramos' professional reputation is on the line, and he is still a highly respected interpreter at our court. Not by, he's employed by the defense as much as the government, but by the district court judges. They still think he is. And I won't say anything about the other interpreters in this case, but Mr. Ramos. I mean, he may have been having a bad day for all I know. He may have. We have a record with the statements that we have. And I did note that I think the judge was wrong to say to Mr. Pineda-Hernandez that you have only two choices. You can accept the first day, or you can have a redo. That wasn't true. Mistrial was a choice. And maybe just starting over again from a clean slate would have been optimal, but of course he doesn't ask for it. And the judge could have had very good reasons for not introducing that thought herself. I'm going to pile on just for a minute because that's been a question of mine. That at trial, the defendant seemed both to be asking to have Barragan-Lopez testify again and also asserting pretty clearly that he did not wish to waive any rights to an appeal. But the district court judge clearly gave him the choice between the two. He could not have both. And my question has been, how can this be a knowing waiver? Well, the waiver point, the government's waiver point is he asked, or he didn't ask. He agreed to the remedy the district court proposed. That remedy fixed any certainty problems. He didn't agree. He agreed under reservation, so to speak. Well, the first utterance from, first of all, this isn't like the right to testify, which is only personally waivable. He had a good defense attorney, and that defense attorney helped him through the waiver issue. The first utterance when the court was contemplating whether or not to recall Barragan-Lopez was the defense counsel saying, I think that's a good idea. And that was before this Morton's Fork was proposed, and the idea then that we're going to say to the district court, heads I win, tails you lose, is I think, although this isn't a typical waiver, he should not be able to challenge the thing that he asked the district court to do, especially when he took advantage of it strategically. He, not only with Cross, but in closing argument, they pointed to what they said, he's a liar, look at the inconsistencies in his statements. Well, they're making the best of a bad situation. I mean, the district court is forcing this solution on him, and he's trying to preserve his right to do exactly what he's doing here, to say on appeal this was the wrong solution. The district court should have, you know, slowed down, taken a look at a wider array of options, one of which certainly included mistrial, maybe one of them included more instructions to the jury. I mean, there are other things that could have happened. The district court didn't do some of those. Sure. So then I guess the question becomes, under the mistrial standard, which is a high bar, is this a plain error? And I don't see how it could be, given the nature of the accusations, given how vague they were, given that... I just don't see how this is one witness who his testimony is essentially duplicative of other people's testimony. So how often do people actually make an audio recording in a situation like this? Is that never? I'm unfamiliar with that happening in any of our cases. And we've had, in the last couple of years, the Sinaloa cartel with outstanding defense attorneys who could move for that under the CIA if they wanted to, but didn't. And even in routine cases, I don't know. I would have, frankly, loved that as the person reviewing the record to present to this court, and I've never been able to avail myself of that. I can't say for sure, but I'm unfamiliar with that procedure in our court. I don't know if that is unusual to our court. I don't know about other districts, but I'm not familiar with that happening very much. I mean, it would create a much better record for this court, because translation of something that was captured on the audio could be done in a much more careful, you know, with a little more time to think about the right way to translate what's being said.  And I think that's a separate question. And under the statute, it doesn't kick in without a motion. And there was no motion. And no one ever makes a motion, you're saying. You know, that's a separate question. Maybe in some of these big, complicated, month-long Spanish-speaking trials, someone made a motion that was denied, and no one ever appealed it. I don't know the answer to that either. I can't say one way or the other. And let me see if there are any other rebuttal points that I have. I don't think so. With that, Your Honors, I'd rest on the government's brief. All right. Thank you so much. Mr. Henderson? The government invoked Dwaynus, which would be an argument that the statute is not overbroad. The government has conceded that it is overbroad in its brief. So we think that it has waived that argument. As the Court pointed out, Gates is a non-precedential, unpublished decision that is not to be cited to any court. And in any case, Gates involved different weights of different drugs. And so the majority of the analysis in that case is exactly what we are proposing. So unless the Court has any further questions, I will rest. Thank you. All right. Thank you. And your time basically ran out, Mr. Ball, but if you need a minute, I'll give it to you. Borrow it from Mr. Henderson. Your Honor, I won't take up this Court's time. Just happy to answer any questions if the Court has any. Otherwise, I respectfully request a new trial. Thank you, Your Honor. All right. Thank you. Thanks to all counsel. And thank you, Mr. Ball, for accepting the appointment. We appreciate it. Of course, thanks to Mr. Henderson and Mr. Wood as well. Case will be taken under advisement.